JAMES E. CECCHI
LINDSEY H. TAYLOR
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN, PC
5 Becker Farm Road
Roseland, New Jersey 07068-1739
(973) 994-1700
*Attorneys for Plaintiff Christopher Mathieson*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER MATHIESON, <br><br> Plaintiff, <br><br> -against- <br><br> JOHN. C. DENIRO, <br><br> Defendant. | Docket No. <br><br><br> **VERIFIED COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiff Christopher Mathieson ("Mathieson" or "Plaintiff"), by way of a Verified Complaint against Defendant John C. DeNiro ("DeNiro" or "Defendant"), alleges as follows:

### NATURE OF THE ACTION

1.      This Verified Complaint asserts claims against DeNiro stemming out of his unlawful efforts to seize sole control of JC DeNiro & Associates, L.L.C. ("JCD"), a successful real estate brokerage business founded and built by Mathieson.  In particular, this Verified Complaint alleges that DeNiro has, contrary to his contractual and fiduciary responsibilities, implemented a comprehensive scheme to divest Mathieson of his membership interest in JCD and to divert JDC's assets to DeNiro.  To accomplish this unlawful objective, DeNiro has engaged in a variety of tortious and contractually prohibited acts against Mathieson including, but not limited to: (1) preventing Mathieson from accessing JCD's offices; (2) converting Mathieson's membership interest in JCD without compensation; (3) converting Mathieson's

earned wages; (4) converting and seizing control of Mathieson's car; (5) preventing Mathieson from conducting the affairs of JCD; (6) attempting to sell the assets of JCD without Mathieson's approval; and (7) defaming Mathieson.

2.      This Verified Complaint seeks an accounting of JCD to establish Mathieson's economic interest in JCD and the monies due to him from JCD, both as a consequence of past transactions as well as ongoing real estate transactions scheduled to close in the coming months. This Verified Complaint also asserts claims for constructive trust, unjust enrichment, breach of contract, and breach of fiduciary duty relating to DeNiro's purported expulsion of Mathieson as a member of JCD.   In addition, this Verified Complaint asserts claims for conversion and constructive trust relating to DeNiro's unlawful attempt to sell or dispose of all or substantially all of JCD's assets without Mathieson's consent.

## THE PARTIES

3.      Plaintiff Christopher Mathieson is a citizen of the State of New York, residing at 34 Eighth Avenue, 5A, New York, New York 10014.  Mathieson is a member of JCD.

4.      Defendant John C. DeNiro is a citizen of the State of Florida, and maintains a principal place of business at 824 East Atlantic Avenue, Suite 7, Delray Beach, Florida 33483. DeNiro is a member of JCD.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction of this claim pursuant to 28 U.S.C. § 1332(a) because it is between citizens of different States and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Mathieson resides in this judicial district and a substantial part of the events giving rise to this claim occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

**A.      Formation And Purpose Of JCD.**

7.      In or about mid-2002, Mathieson developed a plan for establishing and operating a residential real estate brokerage firm in lower Manhattan utilizing a grant from the Lower Manhattan Development Corporation.

8.      In or about August 2002, Mathieson and DeNiro met while both men were in Boca Raton, Florida.

9.      During their meeting, Mathieson mentioned his plan to start a real estate brokerage firm.  As conceived by Mathieson, the business was designed to fill a need in the New York real estate market – in particular, a boutique brokerage firm that could provide personal service to customers at the high-end of the market.  DeNiro expressed interest in Mathieson's plan and suggested that they meet again to discuss it.

10.      As a result, Mathieson developed a business plan for the proposed business, and shortly thereafter, he again met with DeNiro to discuss his ideas.

11.      The parties eventually agreed to jointly develop the project by which both parties would be members of a newly formed company, JCD.  DeNiro agreed to contribute his know-how based on his experience in real estate as well as venture capital.  Mathieson would be responsible for starting up the company, attending to its day-to-day operations, soliciting accounts, and growing the business.

12.    In or about October 2002, the parties signed an Operating Agreement for the company, which was prepared by Jose Lorenzo, Esq., DeNiro's long-time counsel.

13.    Mathieson was not represented by an attorney in connection with the preparation, negotiation, and/or execution of the Operating Agreement.

14.    To induce Mathieson to sign the Operating Agreement, DeNiro and Lorenzo told Mathieson that Lorenzo represented JCD and the best interests of both members.

15.    Upon information and belief, Lorenzo's and DeNiro's representations regarding Lorenzo's representation of JCD were false and misleading statements of material fact designed to induce Mathieson to execute an Operating Agreement, which contained a variety of provisions that were unduly favorable to DeNiro.

16.    Upon information and belief, Lorenzo represented only DeNiro's interest in connection with the preparation and execution of the Operating Agreement. As a consequence of Lorenzo's and DeNiro's false statements regarding Lorenzo's representation of JCD, and as a consequence of Lorenzo's conflict of interest, the Operating Agreement is either void *ab initio* or voidable in part.

17.    The Operating Agreement provided, *inter alia*, that DeNiro would have a 60% interest in the company and that Mathieson would have a 40% interest in the company, and that both parties had the right to participate in the management and conduct of the JCD's business.

18.    On or about October 15, 2002, Mathieson and DeNiro filed papers forming JCD as a limited liability company under the laws of the State of New York.

19.    As part of their agreement and in exchange for Mathieson's management of JCD's operations, Mathieson received 100% of the commissions on properties he sold for JCD. DeNiro provided no personal assistance to JCD other than providing limited venture capital.

20.    Under the parties' agreement, DeNiro was also entitled to receive 100% commission on any real estate sale he originated and closed. Mathieson and DeNiro agreed that they would divide profits generated from real estate sales originated by other brokers. They similarly agreed that DeNiro and Mathieson would obtain salary when JCD's cash flow was sufficient.

**B.    The Development And Operation of JCD's Business.**

21.    During the start-up period, Mathieson oversaw the day-to-day operations of the company, acquired office space, hired and trained personnel and agents, and developed business for the company.

22.    JCD opened its first office in the TriBeCa neighborhood of Manhattan and began acquiring clients and signing deals in an area of Manhattan hard hit from the economic downturn caused by the September 11th terrorist attacks on the World Trade Center.

23.    Between 2003 and 2005, Mathieson worked diligently to build JCD's reputation and business. He personally supervised aspects of JCD's business, including the selection of office space, furniture, the hiring and training of agents, and growing the business of the company. Because of his original idea, the business thrived and slowly grew into a recognized presence in the real estate market. As a consequence of Mathieson's efforts, JCD developed valuable good will associated with its brand and its signature method of operating in the New York City real estate marketplace.

24.    Between 2003 and 2005, JCD continued to grow and expand its operations by opening additional locations on the Upper West Side, in Chelsea and the West Village, and opening and expanding its Chelsea location.

25.    Mathieson devoted substantial time and effort growing JCD's business, and deferred substantial earned commissions to pay for JCD's expansion, growth, and operation.

26.    The deferred earned commissions constitute loans repayable to Mathieson at normal and prevailing interest rates.

27.    In contrast, during the last five years, DeNiro visited New York City for a total of approximately 30 days, and did not contribute substantial time, energy or resources to develop JCD's brand and business.  In fact, during the last five years, DeNiro was responsible for referring only one customer to JCD.

**C.    JCD Expands Its Business To Include Residential Development Projects.**

28.    In or about 2005, Mathieson determined that JCD had an opportunity to expand its business by moving from simply a resale-based agency to one that also excelled at marketing and selling new developments.  He explained his plan to DeNiro, and thereafter, undertook to expand JCD's business into the new development market.

29.    To achieve the object of growing JCD's presence in the new development sector, Mathieson spent considerable time developing relationships with various developers.

30.    In mid-2006, Mathieson secured JCD's first development contract for a new construction leasing project on West 16th Street.

31.    In the first half of 2007, Mathieson secured several other exclusive agreements for new development projects, including: (i) the "Morgan Lofts" condominiums located at 11 East 36th Street, which comprised approximately 30 sell and lease units; (ii) a new condominium development project located at 552 West 43rd Street; (iii) a new condominium development located at 111 Fulton Street with 105 units with a potential of 163 total units; and (iv) a new condominium project located at 123 Baxter Street with 23 units.

32.     These projects and other new development projects secured by Mathieson have successfully expanded JCD's business.

**D.     The Purported Expulsion Of Mathieson As A Member Of JCD.**

33.     In or about spring 2007, DeNiro informed Mathieson that, contrary to the parties' long-standing agreement, he was unilaterally altering the parties' commission agreement.  In particular, DeNiro stated that he would only agree to pay Mathieson an 80% of the total commission on resale accounts.  Contrary to the facts, DeNiro claimed that these changes were necessitated by JCD's purported financial difficulties.

34.     Later that spring, DeNiro told Mathieson that he was also revising their commission agreement on new development projects, whereby he would only agree to pay Mathieson 10% of total commissions earned on new developments originated by Mathieson.

35.     At the same time, DeNiro advised Mathieson that he was not going to let Mathieson make more money than him.

36.     DeNiro also informed Mathieson that the $300,000.00 owed to Mathieson from deferred commissions was being reduced by 20%, and stated that the number would need to be further reduced because of additional expenses incurred by JCD.

37.     Mathieson requested an accounting but DeNiro refused to provide one and refused to provide a time frame for paying Mathieson his unpaid commissions.

38.     Mathieson also requested that DeNiro provide him with information on JCD's debts and other financials, but DeNiro refused to provide any detailed information to Mathieson.

39.     In mid-2007, Mathieson learned that DeNiro removed him as a signatory on JCD's bank account.

40.     On or about August 30, 2007, Mathieson submitted a commission invoice for a recent sale that he procured.   Under the revised commission protocol imposed by DeNiro, Mathieson was entitled to receive 80% of the commission.

41.     Without notifying Mathieson, DeNiro reduced Mathieson's portion of the commission by $7,983.33 because DeNiro identified the sale as a referral that he made.

42.     DeNiro later explained the withholding was a mistake but stated he needed additional information unrelated to this transaction before he cut another check for the withheld money owed to Mathieson.

43.     Contrary to DeNiro's continued assertion that JCD was in "bad shape," monthly statements from JCD's bank account showed approximate monthly averages of $500,000.00 in gross commissions up to September 1, 2007, which was substantially more than the monthly average for 2006.  In addition, JCD's gross income for June 2007 was $965,897.02, which was JCD's single highest month ever for gross commissions.

44.     On or about September 18, 2007, DeNiro came to New York and told Mathieson that he was being "expelled" as a member of JCD and that DeNiro had no intention of paying him a penny for his membership interest.  DeNiro also physically barred Mathieson from JCD's offices and terminated Mathieson's e-mail account and cell phone service.

45.     Contrary to New York law, DeNiro has also instructed JCD employees to withhold Mathieson's paycheck, as well as commission income due to him from JCD.

46.     On or about September 20, 2007, DeNiro and others working with him stole Mathieson's car from the New York City parking garage where it was parked.  Upon information and belief, DeNiro gave permission to his granddaughter to use the vehicle.  Approximately, two days after the theft, Mathieson's car was returned to the garage without explanation.

47.    On September 28, 2007, DeNiro and/or his granddaughter again stole Mathieson's car from the parking garage by lying to the garage attendant that the vehicle did not belong to Mathieson. They have yet to return Mathieson's car.

48.    Upon information and belief, DeNiro is attempting to sell JCD and has taken steps to replace Mathieson as manager of JCD.

49.    Upon information and belief DeNiro recently stated that JCD was worth $5,000,000.00. Upon information and belief, DeNiro also offered Stephen McArdle, a former employee of JCD, a job with JCD along with a 25% interest in the company.

50.    Shortly after their meeting on September 18 2007, DeNiro disparaged Mathieson in front of JCD employees and told them that he does not care if they all leave the company because he will hire new agents.

51.    To date, Mathieson has not received any written communication from DeNiro setting forth his reasons for purportedly expelling Mathieson as a member of JCD.

52.    Up until October 1, 2007, Mathieson was still identified as the managing member of JCD on JCD's Web site, and his name still appeared on the doors and in the windows at JCD's offices.

53.    Upon information and belief, JCD continues to solicit business using Mathieson's reputation and through accounts procured by Mathieson, closing continue to occur on accounts originated by Mathieson for which Mathieson has not been paid.

54.    Mathieson is the licensed real estate broker for JCD.

55.    Upon information and belief, DeNiro is not also a licensed real estate broker for JCD with the State of New York.

56.    If Mathieson is not longer affiliated with JCD, as alleged by DeNiro, then the real estate salespersons employed by JCD would be doing business without being affiliated with a licensed broker for JDC in violation of New York law.

57.    On September 26, 2007, Mathieson, through counsel, demanded that DeNiro restore the *status quo* as it existed prior to his illegal actions against Mathieson. Mathieson further demanded that safeguards be implemented to insure that corporate funds were not diverted to DeNiro or anyone else for inappropriate or extraordinary expenditures.

58.    To date, DeNiro has refused to respond to Mathieson's demands and has refused to reverse the illegal actions taken against Mathieson.

59.    The actions taken by DeNiro are designed to enrich himself to the exclusion of Mathieson and JCD.

60.    DeNiro's actions are illegal and have already caused significant damage to both Mathieson and JCD.

61.    Without Mathieson's participation and guidance, JCD will, in all likelihood, be unable to survive.

**E.    DeNiro's Financial Well-Being.**

62.    In or about 2006, Mathieson learned that DeNiro was experiencing mounting financial problems with his own real estate ventures in Florida, resulting from declining market conditions, overruns, delays, hurricanes, and litigations, and that DeNiro was liquidating his assets, including his primary residence. As a consequence, he is experiencing severe financial difficulties. As a result of these difficulties, DeNiro set in motion the aforementioned scheme to divest Mathieson of his position within JCD and to divert JCD's liquid assets to himself.

63.     On or about July 31, 2007, after DeNiro had removed Mathieson as a signatory on JCD's bank account, DeNiro transferred $130,000.00 by wire from JCD's corporate bank account to a separate corporate account for one of his developments in Florida. Although the money was returned the following day, DeNiro is improperly commingling JCD's liquid assets with unrelated (and failing) development projects originated by DeNiro in Florida.

## FIRST CAUSE OF ACTION
### (Access to Company Books and Records)

64.     Mathieson repeats, reiterates, and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth at length herein.

65.     Section 6.1 of the Operating Agreement provides: "The Members must keep such books and records relating to the operation of the company as are appropriate and adequate for the company's business and for the carrying out of this agreement."

66.     Section 6.1 of the Operating Agreement also provides: "Each Member will have access to all such books and records at all times."

67.     New York Limited Liability Company Law § 1102(b) provides a member with the right to inspect a limited liability company's books and records and any other information regarding the affairs of the company.

68.     DeNiro has failed and refused to provide Mathieson with access to JCD's books and records, information with respect to JCD's affairs, Mathieson's membership interest, and the purported sale of JCD.

69.     Mathieson is entitled to receive this information and is entitled to review JCD's original books and records relating to its affairs.

70.     DeNiro has no reasonable basis to refuse to provide this information to Mathieson or to prevent Mathieson from inspecting JCD's books and records.

71.    Mathieson has been damaged by DeNiro's failure to permit inspection of all of the books and records of JCD.

72.    WHEREFORE Plaintiff hereby demands the following relief against Defendant:

a.    An order granting Plaintiff, or his representative(s), the right to inspect JCD's books and records;

b.    An order requiring Defendant to provide information requested by Plaintiff related to JCD's affairs;

c.    Compensatory damages;

d.    Attorney's fees;

e.    Costs of suit; and

f.    Such other relief as the Court deems equitable and just.

<u>**SECOND CAUSE OF ACTION**</u>
**(Breach of Contract)**

73.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth at length herein.

74.    DeNiro has breach his agreement with Mathieson by, *inter alia*:

i.    Impeding Mathieson's right to participate in the management and conduct of JCD;

ii.    Improperly and without authority, attempting to sell or otherwise transfer or dispose of the property or assets of JCD, and/or admitting additional members to the company;

iii.    Violating his duties and obligations to JCD by engaging in acts of self interest by using or usurping the assets of JCD;

iv.    Improperly terminating Mathieson as the managing member of JCD;

v.      Improperly expelling Mathieson as a member of JCD;

vi.     Refusing to pay wages and commission earned by Mathieson; and

vii.    Refusing to pay Mathieson for his membership interest in JCD;

75.    As a direct and proximate result of DeNiro's breach as aforesaid, Mathieson has and will continue to suffer damages, including but not limited to, the diminution in the value of his membership interest in JCD.

76.    Mathieson has no adequate remedy at law.

WHEREFORE, Plaintiff demands the following relief against Defendant:

a.     Compensatory damages, including but not limited to the diminution in the value of Plaintiff's membership interest in JCD;

b.     Punitive damages;

c.     Interest;

d.     Cost of suit;

e.     Attorney's fees; and

f.     Such other relief as the Court deems equitable and just.

### THIRD CAUSE OF ACTION
#### (Breach of Fiduciary Duty)

77.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth at length herein.

78.    DeNiro has a fiduciary duty to conduct JCD's affairs according to principles of good faith and utmost fidelity.

79.    DeNiro breached the aforesaid obligations by, *inter alia*: (1) attempting to sell or otherwise transfer or dispose of the property or assets of JCD without authorization from Plaintiff; (2) engaging in self-dealing by authorizing purported loans to either himself and/or

affiliated entities; (3) failing to distribute monies to Mathieson; (4) refusing Mathieson access to JCD's books and records; (5) improperly and without justification terminating Mathieson as the managing member of JCD; (6) improperly and without justification expelling Mathieson as a member of JCD; and (7) attempting to sell JCD and/or admit additional members without the consent of Mathieson.

80.     Plaintiff has suffered special injury as a result of DeNiro's misconduct.

81.     Plaintiff does not have an adequate remedy at law.

WHEREFORE, Plaintiff demands the following relief against Defendant:

a.     A temporary, preliminary, and permanent injunction enjoining Defendant from refusing Plaintiff access to JCD's books and records;

b.     A temporary, preliminary and permanent injunction enjoining Defendant from terminating Plaintiff as the managing member of JCD;

c.     A temporary, preliminary, and permanent injunction enjoining Defendant from withdrawing any funds from JCD's corporate bank account for personal reasons;

d.     An order permitting Plaintiff to appoint an interim agent to manage the corporate affairs of JCD, or in the alternative, a receiver appointed by the Court to manage the corporate affairs of JCD until further order of the Court;

e.     A temporary, preliminary, and permanent injunction enjoining Defendant and/or any agent, servant, employee, or attorney acting on his behalf, from transferring, converting, accessing, and/or withdrawing in full or any portion of JCD's assets;

f.     An order declaring that Defendant has violated and breached the Operating Agreement and his fiduciary duties of loyalty and fidelity;

g.   A temporary injunction enjoining and restraining Defendant and any persons in active concert or participation with him from withdrawing, disbursing, transferring, pledging, hypothecating or otherwise dissipating or encumbering in any manner all assets maintained by and on behalf of JCD;

h.   A temporary and preliminary injunction enjoining Defendant from disposing, pledging, assigning, transferring, hypothecating, or otherwise dissipating or encumbering in any manner all assets subject to the constructive trust;

i.   Damages, including the return and disgorgement of all monies owed to Plaintiff, including wages and commissions;

j.   Interest;

k.   Cost of suit;

l.   Attorney's fees; and

m.   Such other relief as the Court deems equitable and just.

## FOURTH CAUSE OF ACTION
### (Membership Accounting)

82.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth at length herein.

83.   Upon information and belief, DeNiro, as the majority member of JCD, has undertaken acts to sell or dissipate all or substantially all of JCD's assets;

84.   DeNiro has improperly and without justification expelled Mathieson as a member of JCD;

85.   DeNiro has refused Mathieson access to JCD's books and records;

86.    As a result of the foregoing, Plaintiff is entitled to determine the value of his interest in JCD or what course of action he should take with respect to his membership interest in JCD.

87.    Without the foregoing information, Plaintiff cannot determine whether he may have additional claims against DeNiro. Such claims could also affect the value of Mathieson's interest in JCD.

88.    Upon information and belief, DeNiro has: (i) engaged in self-dealing; (ii) improperly taken steps to expel Mathieson as a member of JCD; (iii) made efforts to unilaterally sell all or substantially all of the assets of JCD without Mathieson's permission or consent; (iv) withheld wages and commissions from Mathieson; (v) refused to pay Mathieson for his membership interest in JCD; and (vi) otherwise engaged in wrongful and actionable conduct with respect to the management of JCD.

89.    Under all of the facts and circumstances, it is just and reasonable that Mathieson have a formal accounting of JCD's affairs.

WHEREFORE, Plaintiff demands the following relief against Defendant:

a.    A formal accounting of the affairs of JCD;

b.    Attorney's fees;

c.    costs of suit; and

d.    Such other relief as the Court deems equitable and just.

## FIFTH CAUSE OF ACTION
### (Conversion and Constructive Trust)

90.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth at length herein.

91.    Mathieson and DeNiro are both members of JCD.

92.    DeNiro is the purported majority member of JCD.

93.    DeNiro has purportedly expelled Mathieson as a member of JCD.

94.    In the event that DeNiro's expulsion of Mathieson is deemed proper, Mathieson is entitled to have his interest in JCD purchased in accordance with the terms of the Operating Agreement.

95.    DeNiro has refused to pay Mathieson for his membership interest in JCD.

96.    DeNiro has also refused to pay Mathieson for wages and commission earned by Mathieson.

97.    Retention of the monies owed to Mathieson by DeNiro referred to herein constitutes a benefit to DeNiro to which he is not entitled in law or in equity.

98.    Mathieson has no adequate remedy at law.

WHEREFORE, Plaintiff demands the following relief against Defendant:

a.    A temporary and preliminary injunction enjoining Defendant from using, transferring, hypothecating, or otherwise disposing of any or all of JCD's assets subject to the constructive trust;

b.    Attorney's fees;

c.    Costs of suit; and

d.    Such other relief as the Court deems equitable and just.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

99.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth at length herein.

100.    As previously described, DeNiro has wrongfully retained monies that belong to Mathieson.

101.    As a direct and proximate result of DeNiro's wrongful conduct, DeNiro has been unjustly enriched.

102.    As a direct and proximate result of DeNiro's wrongful conduct, Mathieson has suffered and will continue to suffer substantial damages.

103.    Mathieson has no adequate remedy at law.

WHEREFORE, Plaintiff demands the following relief against Defendant:

a.      Compensatory damages;

b.      Interest;

c.      Costs of suit;

d.      Attorney's fees; and

e.      Such other relief that the Court deems equitable and just.

## SEVENTH CAUSE OF ACTION
### (Injunctive Relief)

104.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth at length herein.

105.    As a member of JCD, DeNiro has a fiduciary duty to conduct the affairs of JCD according to principals of good faith and utmost fidelity.

106.    DeNiro owes a fiduciary duty to Mathieson.

107.    DeNiro has breached the aforesaid obligations by, *inter alia*: (i) engaging in self-dealing, (ii) improperly taking steps to expel Mathieson as a member of JCD; (iii) making efforts to unilaterally sell all or substantially all of the assets of JCD without Mathieson's permission or consent; (iv) withholding wages and commissions from Mathieson; (v) refusing to pay Mathieson for his membership interest in JCD; and (vi) otherwise engaging in wrongful and actionable conduct with respect to the management of JCD.

108.    Mathieson has suffered special injury as a result of DeNiro's habitual misconduct as a member of JCD, by *inter alia*: (i) preventing Mathieson from participating in the management and conduct of JCD's business; (ii) conducting business using Mathieson's name and accounts even after purportedly expelling Mathieson as a member of JCD; (iii) diminishing the value of Mathieson's membership interest in JCD and frustrating Mathieson's reasonable expectation of fully participating in the management of JCD and his efforts to access the company's books and records; and (iv) attempting to sell JCD without the consent of Mathieson.

109.    By virtue of DeNiro's refusal to accept Mathieson's legitimate authority to participate in the management of JCD's affairs, and by virtue of Mathieson's inability to end DeNiro's abuse of his position as a 60% member of JCD, there is the substantial likelihood that, absent the entry of an injunction, DeNiro will continue perpetrate such acts without the consent or authority of Mathieson.

110.    DeNiro's conduct threatens the financial stability of JCD and its continued economic viability.

111.    By virtue of Mathieson's inability to effect the management of JCD and to control DeNiro's abuse of JCD's corporate accounts, there is no adequate remedy at law.

WHEREFORE, Plaintiff demands the following relief against Defendant:

a.    A temporary, preliminary, and permanent injunction enjoining Defendant from refusing Plaintiff access to JCD's books and records;

b.    A temporary, preliminary and permanent injunction enjoining Defendant from terminating Plaintiff as the managing member of JCD;

c.    A temporary, preliminary, and permanent injunction enjoining Defendant from withdrawing any funds from JCD's corporate bank account for personal reasons;

d.   A temporary, preliminary, and permanent injunction enjoining Defendant and/or any agent, servant, employee, or attorney acting on his behalf, from transferring, converting, accessing, and/or withdrawing in full or any portion of JCD's assets;

e.   A temporary, preliminary and permanent injunction enjoining and restraining DeNiro and those persons in active concert or participation with him from withdrawing, disbursing, transferring, pledging, hypothecating or otherwise dissipating or encumbering in any manner all assets maintained by and on behalf of JCD;

f.   A temporary, preliminary and permanent injunction enjoining and restraining DeNiro from issuing any check from any bank account maintained by JCD, unless such check contains the joint signature of Mathieson;

g.   Compensatory damages;

h.   Punitive damages;

i.   Interest;

j.   Cost of suit;

k.   Attorney's fees; and

l.   Such other relief as the Court deems equitable and just.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN, PC
*Attorneys for Plaintiff Christopher Mathieson*

By: _____
    LINDSEY H. TAYLOR

Dated: October 2, 2007

## JURY TRIAL DEMAND

Plaintiff Christopher Mathieson hereby demands a trial by jury as to all issues so triable.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN, PC
*Attorneys for Plaintiff Christopher Mathieson*

By: _____
    LINDSEY H. TAYLOR

Dated: October 2, 2007

## <u>VERIFICATION</u>

CHRISTOPHER MATHIESON, according to law, duly certifies:

1.     I am the plaintiff named in this action and am familiar with the facts underlying this action.

2.     The allegations contained in the Verified Complaint and Jury Trial Demand are true to the best of my knowledge and belief.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
CHRISTOPHER MATHIESON

DATED:  October 2, 2007

#3285398v1