UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— :

CHRISTOPHER MATHIESON,

      Plaintiff
      v.                                DOCKET NO.
                                        1:07-cv-08527-LAK

JOHN C. DENIRO,

      Defendant

———————————————————————— :

      JOHN C. DENIRO, being duly sworn, deposes and says:

      1.     I am the defendant in this action and submit this affidavit in opposition to plaintiff's motion for a preliminary injunction. I am fully familiar with the facts stated herein based upon my personal knowledge.

      2.     I have read the declaration of plaintiff Christopher Mathieson submitted in support of his motion. There are many inaccuracies, omissions and outright falsehoods made by him that require correction. Plaintiff's declaration has created a false and misleading picture of the operation of J.C. DeNiro & Associates, LLC ("JCD") and Mr. Mathieson's conduct and role therein.

      3.     In the Summer of 2002 Mr. Mathieson met with me in Florida to discuss the formation of a real estate company to do business in New York City. I knew Mr. Mathieson as he had worked for me previously in 2000, as an assistant in a company I owned, J.C. DeNiro International Real Estate, Inc. He had worked for a short period of time before quitting.

      4.     The essential elements of our agreement to form this company were that I would be the majority owner with 60% ownership interest and he would have a minority interest of 40%. The company would trade on my good name and reputation, hence the company was named "J.C.

DeNiro & Associates, LLC." Besides using my name for the company, I was making an initial capital contribution of $10,000. Mr. Mathieson was making no cash contribution, but would provide "future services" to the company. Mr. Mathieson agreed to devote his full time and attention to the business, not to compete with the business and while a member of the company and for a twenty year period afterward he could not use the name "DeNiro" or a similar name in the real estate business.

5.    Our discussions led to the formation of J.C. DeNiro & Associates, LLC in October, 2002. An Operating Agreement for the company, Exhibit "A", embodied the aforesaid elements we had agreed upon and was drafted by Lorenzo & Pike, LLP, specifically Mr. Lorenzo.

6.    Mr. Mathieson alleges that Mr. Lorenzo and I induced him to sign the agreement by statements that Mr. Lorenzo was representing the best interests of both of us. This is completely false. The final paragraph of the agreement, entitled, "11.12 Legal Counsel" specifically sets forth the relationship of Lorenzo & Pike, LLP to the parties. As is stated in that paragraph, Mr. Lorenzo told each of us to seek our own lawyers before signing the papers but that we had each determined not to do that. **It also acknowledged that each of us had not relied upon any advice rendered by Mr. Lorenzo.**

7.    Upon formation of JCD we found an initial office in New York City which was designed and decorated by my daughter, Ms. Linda DeNiro. Initially, I came to New York from my home in Florida on a regular basis to help get the business on its feet. Mr. Mathieson and I consulted on the hiring of personnel, their training and the direction of the company. In 2004 and 2005 I came to New York less frequently, however Mr. Mathieson was in regular telephone contact with me, sometimes on a daily basis, when I was not in New York.

8. Thereafter, the company grew and we opened additional offices within New York City. The books and records of JCD, including the banking records were maintained in the main office where Mr. Mathieson was based. Mr. Mathieson and I agree that he was in charge of the day to day operation of JCD. This included managing the company bank account, paying bills, maintaining insurance, as well as paying appropriate state and federal taxes.

9. When Mr. Mathieson would speak to me about the condition of JCD, he always reported that we were doing well, and were headed in a positive direction.

10. At the end of February, 2007 the bookkeeper who had worked for us for 3 years quit unexpectedly. She called me to tell me she was leaving, saying that she could not continue to work with Mr. Mathieson and that I should get a copy of the company bank records from him. My office staff in Florida requested from Mr. Mathieson these bank records and after several requests I received "Quick Book" electronic data records beginning with the year 2006. Upon an initial analysis of a summary report of bank charges entitled "Account Quick Report" for 2006, Exhibit "B", there were nearly $7,000.00 in bank charges for checks presented on the account for which there were insufficient funds resulting in "NSF" charges. I was shocked to learn of this mismanagement by Mr. Mathieson, and I began asking for copies of other records, bills, and correspondence coming into the New York office.

11. Upon receiving these documents over the next few months, evidence of a pattern of gross mismanagement of JCD by Mr. Mathieson became clear. There were communications from the Internal Revenue Service of unpaid taxes, missing reports and penalties assessed for the years 2004, 2005 and 2006 and a "Final Notice of Intent To Levy for over $6,000.00, Exhibit "C".

3

12. Mr. Mathieson had failed to pay New York City taxes as well. I received a Notice of Tax Due showing unpaid taxes and penalties of $10,485.79 for 2005, Exhibit "D".

13. Mr. Mathieson had failed to pay Workers Compensation Insurance from February 12, 2006. The amount owed, with penalties totaled $10,750.00, Exhibit "E".

14. I also learned that as of November 25, 2004, Mr. Mathieson had failed to maintain the "Errors and Omissions" liability policy, and it had expired, Exhibit "F". A search of the bank records received from Mr. Mathieson revealed no payments made for this insurance. This policy is essential for the office to operate safely, I therefore purchased a new policy in July, 2007.

15. I also came to learn that there were a large number of unpaid bills from our essential vendors. Mr. Mathieson had failed to pay our photographer, Digital Destinations since 2006 and that JCD owed $10,801, Exhibit "G". The alarm service company Slomin's was owed money from March 2006, Exhibit "H". The exterminator was owed a total of $2,813.40, JCD had been in arrears since October 2006, Exhibit "I". The architect Gregory Zack was owed $5,191.00, Exhibit "J". Mr. Mathieson had failed to pay the Miller Advertising Agency since November 2005, the total indebtedness was $11,601.80, Exhibit "K".

16. Mr. Mathieson had failed to pay Quinn & Co. the company's public relations firm a total of $13,075.28 requiring them to threaten legal action against the company, Exhibit "L". The office supply company Staples had an outstanding bill of $5,864.58 which came to my attention when we received correspondence from a collection agency representing them, Exhibit "M". I received a collection notice on March 16, 2007 from an agency representing Quill Corporation, an office supplier for $4,811.48. That communication indicated that the account might be forwarded to Dun & Bradstreet credit database, thereby damaging our credit rating, Exhibit "N". Statements requesting payment for the Pitney Bowes postage meter lease were in

arrears in the amount of $791.77, and the accompanying "postage by phone" account was in arrears in the amount of $4,080.60, these are annexed collectively as Exhibit "O". The Dell computer company was owed $10,517.24 with mounting monthly finance charges, Exhibit "P".

17. Over the course of the Spring and Summer 2007 I have begun to make payments to the tax authorities, and the various vendors who are owed money, however, the reputation and creditworthiness of J.C. DeNiro & Associates, LLC has certainly been damaged by Mr. Mathieson's failures to manage the company finances responsibly.

18. Mr. Mathieson's damage to JCD's reputation took other forms as well. In November 2004 Ms. Michelle Levy Shulz, a licensed real estate sales person employed by the company, filed a Verified Complaint against JCD and specifically Mr. Mathieson, with the City of New York Human Rights Commission alleging sexual harassment, a hostile work environment and improper firing by Mr. Mathieson, Exhibit "Q". The details of the sworn allegations concerning Mr. Mathieson's conduct are disturbing and create serious consequences for the company.

19. Mr. Mathieson states that he procured several new "exclusive" agreements for projects in 2007 including 123 Baxter Street, 552 West 43rd Street, and 111 Fulton Street "which successfully expanded JCD's business". An analysis of these projects evidences a much different picture.

20. The project known as "123 Baxter Street" is the most troubling. I was unaware of the specifics of the agreement when it was signed by Mr. Mathieson in February, 2007. A copy of the agreement is Exhibit "R". In the beginning of the agreement, the parties are listed as the building owner and "JC DeNiro & Associates/Christopher Mathieson", which was never agreed to by me, however, the signature page has Mr. Mathieson signing for JC DeNiro & Associates.

5

The last page of the agreement is titled "The Baxter Breakdown" and it lists how the One Million Dollar ($1,000,000) commission for the project is to be disbursed. JC DeNiro is to receive $50,000, a notation that something by the name of "M&M" is to receive $559,000. It further shows that "CJM" gets $279,000 and "SM" is to receive $447,000 ($279,000 + $120,000/yr paid by CJM).

21.     I have come to learn that Mr. Mathieson was self dealing in the 123 Baxter Street project. The CJM referenced in the cash breakdown page refers to Mr. Mathieson, the SM refers to Stephen McArdle. The "M&M" refers to a partnership of Mr. Mathieson and Mr. McArdle formed in March 2007 under the name "MATHIESONMCARDLE LLC, the Articles of Organization filed with the Secretary of State for the State of New York are annexed as Exhibit "S". The document shows that Mr. Mathieson was operating his own company with Mr. McArdle from the offices of JC DeNiro & Associates, 174-A Ninth Avenue, New York, New York in violation of the JCD Operating Agreement!

22.     By letters dated September 12, 2007 the American Development Group, LLC, terminated the services of JC DeNiro & Associates services for the following projects: 552 West 43rd Street, 123 Baxter Street, 1 Wadsworth Terrace, 43-45 East 30th Street, collectively as Exhibit "T". These are the projects that Mr. Mathieson stated were successfully expanding the company business.

23.     As a result of the aforesaid events I was left with no option other than to exercise my rights under the company Operating Agreement as majority owner and to expel Mr. Mathieson as a member of J.C. DeNiro & Associates, LLC. On September 18, 2007 when I informed Mr. Mathieson of this decision, he demanded that I buy him out. I told him that he

would receive no money for his interest until the lawyers and accountants completely reviewed all the finances and determined what if anything he might be owed. I also told him he should get a lawyer.

24. Thereafter, by letter dated September 24, 2007, Exhibit "U", which is entitled a "30-Day Notice To Cure Default" I learned that Mr. Mathieson had mismanaged the project at 111 Fulton Street as well. The letter indicates that he violated the "exclusive" sales and marketing agreement by engaging in performing services at competing projects at 11 East 36th Street, 123 Baxter Street, West 43rd Street, and others. The letter also indicates that for "the past 6-7 weeks" beginning in August 2007, Mr. Mathieson had failed to provide services, attend meetings and other enumerated derelictions.

25. Mr. Mathieson has stated in his declaration that I and/or my granddaughter stole "his" car in September after I notified him that he was expelled from the company. This is completely false. The car to which he refers, a 2005 BMW, has never been owned by him. The car was leased by J.C. DeNiro & Associates, LLC, he was allowed to use it while employed by the company. The named lessee is the JCD, the company made the down payment and the lease payments, Exhibit "V". I have also learned that Mr. Mathieson caused JCD to pay for $7,830.00 representing amounts and fines for 119 parking tickets he amassed in 2006, Exhibit "W"!

26. Since the expulsion of Mr. Mathieson from the company I have applied for and received a conditional letter of authorization from the New York Department of State to act as the Real Estate Limited Liability Company Broker for the company for a 60 day period until I receive my permanent license, Exhibit "X".

27. By letter dated October 11, 2007, Exhibit "Y", a courtesy copy of which was sent by fax to plaintiff's attorneys, I informed Mr. Mathieson of my election under the Operating

7

Agreement to continue to operate the company and to purchase his 40% interest in the company as provided for in the agreement.

28.  Mr. Mathieson has alleged that he was to be paid 100% of any commissions he earned for projects brought to JCD. This is absolutely untrue. Our agreement was that he was to receive 80% commission for individual residential resale contracts and 10% of the total amount earned by the company in the marketing of condo/conversion or new condo constructions brought in to JCD. When I learned that he was taking and claiming 100% of the commissions for individual residential resales I reminded him that the agreement was for only 80%.

29.  Mr. Mathieson has made wild accusations that I am diverting JCD's liquid assets to cover real estate losses for unnamed development projects in Florida. This is totally false and is expressly denied.

30.  In the last several months as the proof of Mr. Mathieson's gross mismanagement and wrongful conduct came to light, resulting in his expulsion from JCD, I have made reasonable efforts to mitigate the damage he has caused and to safeguard the assets and good name of J.C. DeNiro & Associates, LLC. I therefore respectfully request that plaintiff's motion for a preliminary injunction be denied in all respects.

_____
John C. DeNiro

Sworn to before me this
day of October 2007.

_____
Notary Public

ANAIS VEIGA
MY COMMISSION # DD 630159
EXPIRES: January 17, 2011
Bonded Thru Notary Public Underwriters