JAMES E. CECCHI
LINDSEY H. TAYLOR
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN, PC
5 Becker Farm Road
Roseland, NJ 07068-1739
(973) 994-1700
*Attorneys for Plaintiff Christopher Mathieson*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER MATHIESON,<br><br>　　　　　Plaintiff,<br><br>-against-<br><br>JOHN. C. DENIRO,<br><br>　　　　　Defendant. | Docket No. 07 CIV 8527 (LAK/KNF)<br><br>**REPLY DECLARATION OF<br>CHRISTOPHER MATHIESON** |

CHRISTOPHER MATHIESON, of full age, declares under penalty of perjury as follows:

1.　I am a member of JC DeNiro & Associates, L.L.C. ("JCD"), a limited liability company organized under the law of the State of New York. I am fully familiar with the facts contained herein based upon my personal knowledge.

2.　I submit this Declaration in further support of my Order to Show Cause for a preliminary injunction against defendant John C. DeNiro.

3.　I have read Mr. DeNiro's sworn statement submitted with his opposition papers. Many of Mr. DeNiro's statements are incorrect, inaccurate, and simply false. They do not tell the whole story about JCD's business and the events leading to his improper expulsion of me as a member of JCD.

4.　Nowhere in his sworn statement does Mr. DeNiro dispute that JCD has been a highly successful company in New York City's competitive real estate market. Through my

hard work and my investment of approximately $300,000.00 of my earned commissions, JCD has become a successful company that has earned in excess of $4,000,000.00 in gross income as of August 31, 2007. In fact, since 2002, JCD's gross income has consistently and dramatically increased over each previous year.

5. Contrary to Mr. DeNiro's contention, the reason we agreed that I would receive 100% commission on individual resale contracts and new development projects that I originated was because I undertook sole responsibility for developing the company's business and infrastructure. In my experience in the real estate industry, agents typically receive between 50% and 75% on sales that they originate. Because of my additional responsibilities, we agreed that 100% of the commission would be appropriate.

6. Mr. DeNiro also fails to mention that it was me – not him – who called for the meeting on September 18, 2007. During that meeting, I initially told Mr. DeNiro that things were not working out because, among other things, I was not being paid commissions that I was owed, Mr. DeNiro was arbitrarily reducing my commissions against what we had previously agreed upon, and he had seized control of JCD's bank accounts by previously removing me as a co-signatory and removing $130,000.00 from JCD's bank accounts. It was only when I confronted Mr. DeNiro with this information that he told me that I was locked out of JCD.

7. In fact, I recently learned that Mr. DeNiro has closed out JCD's bank accounts at HSBC. At the time that Mr. DeNiro locked me out of JCD, there was approximately $200,000.00 in JCD's bank account. As a result of Mr. DeNiro's actions, I have no way of verifying the whereabouts of these funds.

8. Unfortunately, Mr. DeNiro's recent actions threaten the continued success of the company and my membership interest in the company to which I have devoted the last 5 years of

my life. Since my purported expulsion on September 18, 2007, it is my understanding that, under Mr. DeNiro's supervision, 9 of JCD's 34 real estate agents have already left the company . . . a 26.5% reduction in JCD's agent workforce. Attached hereto as Exhibit A is a copy of JCD's agent roster on September 12, 2007 and then on October 15, 2007.

### A.     DeNiro's Involvement With JCD.

9.     At all times, Mr. DeNiro has had unfettered access to JCD's books and records. At no time did I ever deny Mr. DeNiro access to these records or prevent him from being involved in the company's management or operation.

10.    In fact, Mr. DeNiro was personally involved in decisions related to JCD's finances.

11.    Based on his many years of experience as a real estate broker and business owner, Mr. DeNiro acquired the "Error & Omissions" policy on behalf of JCD. At no time did Mr. DeNiro ever ask me to assume the responsibility for maintaining that policy.

12.    As the company continued to grow, Mr. DeNiro and I discussed having Christine Vega, already a member of JCD's support staff, assume responsibility for managing the financial books and records of the company. At that time, Ms. Vega told us that she was qualified to take on this responsibility, which included managing JCD's accounts and balances, performing day-to-day bookkeeping, and paying JCD's bills. Mr. DeNiro and I both agreed to assign these duties to Ms. Vega. In addition, Mr. DeNiro required that she interface with him and his accountant, Paul Adams.

13.    I relied on Mr. DeNiro's representations that he and his accountant would oversee JCD's finances in tandem with Ms. Vega. In turn, I was busy acquiring office space for the

company, opening new offices, hiring and training personnel and agents, and developing business for the company.

14. With the understanding that Mr. DeNiro and his accountant would be overseeing the company's finances, I did not directly supervise Ms. Vega's work in this area.

15. For some time before she left the company, Ms. Vega was negligent in performing her duties. Among other things, she was not providing me with proper information to complete my sales spreadsheets, which allowed me to track and grow sales for JCD. I would provide these spreadsheets to DeNiro so he too could track the performance of the company. On numerous occasions, I reprimanded Ms. Vega for not providing me with this information as it related to my work and the agents' work within the company.

16. In February 2007, Ms. Vega advised both Mr. DeNiro and me that she was leaving the company. As a result, Mr. DeNiro told me that his bookkeeper would take over the bookkeeping responsibilities for the company and would coordinate with Mr. Allen to prepare and file the company's tax returns.

17. In response, I promptly sent Ms. Vega's computer and JCD's financial records to Mr. DeNiro's bookkeeper in Florida. It is my understanding that Mr. DeNiro and/or his bookkeeper were taking over Ms. Vega's responsibilities from that point forward, and I would continue to focus on growing the sales of the company.

18. On February 19, 2007, I also provided Mr. DeNiro's bookkeeper with other financial information from JCD's office. Attached hereto as Exhibit B is a copy of an e-mail dated February 19, 2007, from me to Mr. DeNiro's bookkeeper.

19. At this same time, I sent a spreadsheet detailing the commissions that I had deferred and was owed to Mr. DeNiro's bookkeeper. Attached hereto as Exhibit C is a copy of the spreadsheet. To date, JCD has not paid me these and other commissions that I have earned.

20. At all times, it was my understanding that Ms. Vega would be sending financial information to Mr. DeNiro so that his accountant could prepare and file the state and federal tax returns for the company as he had done for the 2004 taxes. I have since learned that the 2005 tax returns were not prepared on time by Mr. DeNiro's accountant. Attached hereto as Exhibits D and E are JCD's federal tax returns for 2004 and 2005, respectively.

21. I had no involvement at all in the preparation, filing, or management of the company's taxes. I had no knowledge that taxes were not being paid since I was told Mr. DeNiro's accountant had taken full responsibility for managing the company's federal and state taxes.

**B.    Michelle Levy Shulz's Claim.**

22. I cannot fathom any reason why Mr. DeNiro decided to bring up the complaint filed by Ms. Levy against JCD and me. As Mr. DeNiro well knows, Ms. Levy was a former disgruntled employee. It is my understanding that her complaint was investigated and subsequently dismissed by the New York Commission on Human Rights upon a finding that her allegations were baseless and without merit.

23. I cannot understand Mr. DeNiro's decision to publicly resurrect this incident, which had been resolved nearly four years ago, other than to cause me embarrassment and harm to my name and reputation.

### C. The Baxter Street Project.

24. During negotiations on the Baxter Street project, the developer conditioned listing the project with JCD on Stephen McCardle being involved with the project.

25. As the mechanism of attracting Mr. McCardle to JCD, Mr. McCardle and I agreed to form a separate company, MATHIESONMCCARDLE, LLC ("MM"). It was never my intention to use MM to compete with JCD, to interfere with my responsibilities and duties to JCD, or to divert business away from JCD, but rather to enhance JCD's portfolio of accounts by attracting another project from the developer of the Baxter Street project, with whom JCD was conducting other business, and Mr. McCardle, to JCD.

26. The document identified as "The Baxter Breakdown" was prepared by Mr. McCardle. This document was only intended as an initial, internal outline of funds and was never used to dictate the distribution of commissions earned on the project.

27. For example, Hunie Kwon and Nikki Martin were going to potentially be on-site agents for the project. These individuals, however, never worked on the project and were never paid for any work related to the project.

28. Exhibit R annexed to Mr. DeNiro's sworn statement erroneously includes the "Baxter Breakdown" document. That page was never part of the contract for the Baxter project, the developer was never provided this document, and he did not sign it.

29. In spring 2007, Mr. DeNiro told me that he had learned about MM and asked me what it was about. As stated above, I told him that it was the mechanism by which I was able to secure the Baxter Street project for JCD and bring Mr. McCardle to JCD. Mr. DeNiro advised me that he disapproved of my tactics, and I assured him that no business would be conducted through MM that would impede my obligations to JCD.

30. To date, MM has not conducted any business whatsoever.

31. I am identified in all of JCD's listing agreements because I was the licensed broker for JCD. As standard operating procedure, the broker is named in these agreements, and thus, "JC DeNiro & Associates/Christopher Mathieson" is named as a party to represent that I was the licensed broker signing on behalf of JCD. Furthermore, Mr. DeNiro had let his broker's license lapse in or about 2005. As a result, I had to ensure that JCD was practicing under my current broker's license.

32. The final agreement detailing the commission split between Mr. McCardle and JCD on the Baxter Street project was signed on or about August 14, 2007. Attached hereto as Exhibit F is an unsigned copy of the August 14, 2007 agreement. It must be noted that the same $50,000.00, which DeNiro erroneously contends was the total amount of commissions JCD was to receive on the project, was actually the amount to be taken off before commissions were paid to compensate JCD for its support staff provided on the project. This amount was never intended as the total commission that JCD was to receive on the project. Attached hereto as Exhibit G is a spreadsheet breakdown on the Baxter Street Project.

**D.    The District Project.**

33. Contrary to Mr. DeNiro's assertions, the project located at 111 Fulton Street ("District") was not mismanaged or mishandled.

34. From the start, Mr. DeNiro considered the District project "not a great deal" because he did not believe JCD could sell the number of units required by the contract for the District project. Attached hereto as Exhibit H is a copy of an April 26, 2007 letter from Mr. DeNiro to me.

35. Attached hereto as Exhibit I is a copy of the Exclusive Sales and Marketing Agreement dated March 19, 2007 (the "District Contract"), between JCD and Leviev Fulton Club, LLC ("Leviev"), the developer for the District project.

36. Paragraph 6(a) of the District Contract required that JCD sign 68 units under contract within 8 months. The contract update dated September 18, 2007, from sales office at District indicates that 65 units were under contract with in 6 months with 7 more contracts pending, which exceeded the contract requirement. Attached here as Exhibit J is an excel spreadsheet detailing the units under contract at District.

37. Section 2 of the District Contract specifically contains an exclusion for current JCD projects. At the time JCD entered into the District Contract, JCD was already under contract for the 11 East 36th Street, 123 Baxter Street, and 552 West 43rd Street development projects. Attached hereto as Exhibits K, L, and M, are the sales agreements for each of these three projects, respectively.

38. In addition, the contract for the 343 West 16th Street project was signed in the mid-2006, and thus predates the District contract. That contract was also for the lease of a building, and thus, does not compete with the District project. Attached hereto as Exhibit N is an unsigned copy of the contract for the 343 West 16th Street project.

39. The remaining allegations contained in Leviev's September 24, 2007 letter are incorrect. Up until September 18, 2007, the day on which Mr. DeNiro locked me out of the company, JCD has been involved with the District project as required by the District Contract.

40. For example, on September 17, 2007, I had organized and attended a meeting with the District developers and public relations agents to discuss various aspects of the project

8

and to strategize our marketing objectives going forward. Attached hereto as Exhibit O is a copy of the meeting notes for the September 17, 2007 meeting.

41. In addition, during this time, JCD continued to be actively involved in the marketing and advertising of the District project and provided Leviev with updates as required by the District Contract. Attached hereto as Exhibit P are copies of various e-mails dated between September 4, 2007 and September 18, 2007 detailing the work performed by JCD during this time.

42. It was not until after Mr. DeNiro expelled me from the company that things began to deteriorate on the District Project since I was no longer personally involved.

43. On October 13, 2007, I spoke with Joseph Klaynberg, Leviev's managing member. Mr. Klaynberg advised me that Mr. DeNiro has only met with him twice since September 24, 2007, and has not responded to Leviev's 30-day notice letter.

44. If Mr. DeNiro does not address these issues, JCD risks losing in excess of $600,000.00 in compensation on this project and incurring additional expenses by having to pay out approximately $500,000.00 in salary and commissions, which could in effect negate the commissions earned on the 72 units that I have already sold.

45. In addition, after the District contract was signed, Mr. DeNiro informed me that I would be paid only 10% of the total amount earned on the project or approximately $75,000.00, even though I was Director of Sales working three years to get the listing, spent a year servicing the project, creating the sales center, hiring all the staff, creating the pricing plan, driving all the buyer traffic, and managing every aspect of the sales and marketing on the project. Such a scheme would essentially pay me far less than the on-site sales agents who I had hired for the

project . . . approximately $250,000.00 for each agent. Attached hereto as Exhibits Q and R are the contracts for the 2 on-site sales agents for the District Project.

E.   **The American Development Group Projects.**

46.   There are plausible reasons why the American Development Group, LLC ("ADG") terminated several projects it had with JCD, none of which were the result of my actions.

47.   Mr. McCardle was involved with the Baxter Street project and written into the Baxter Street project. It is likely that ADG terminated its agreement with JCD on this project because Mr. McCardle has left JCD.

48.   The listing agreement for the 43-45 East 30 Street project had expired at the time ADG sent its letter to JCD.

49.   It is my opinion that ADG erroneously terminated the contract for 552 West 43rd Street project.

50.   JCD never had a written listing agreement with ADG on the 1 Wadsworth Terrace project.

51.   It is my understanding that Mr. DeNiro has been and is presently involved with several litigations against him in Florida. Mr. DeNiro has also personally told me that he was forced to sell his primary residence in Florida and that his other real estate projects down there were experiencing financial difficulty. I therefore surmise that Mr. DeNiro's irrational actions with regard to JCD and me are a result of his financial troubles.

52.   Mr. DeNiro does not dispute that the insurance and registration for my vehicle are in my name. As a result, I have responsibility for this vehicle and it should be returned until this matter is resolved.

I hereby declare under penalty of perjury that the foregoing statements are true and correct.

_____
CHRISTOPHER MATHIESON

Dated: October 15, 2007

#329571v1