# EXHIBIT A

# OPERATING AGREEMENT
## OF
## J.C. DeNIRO & ASSOCIATES, LLC


### RECITAL:

The parties to this agreement (the "Members") are entering into this agreement for the purpose of forming a limited liability company (the "Company") under the Limited Liability Company Act of the State of New York (the "Act").


### AGREEMENTS:

1.    **Formation**

   1.1    **Name.** The name of the company is J.C. DeNIRO & ASSOCIATES, LLC.

   1.2    **Articles of Organization.** Articles of organization for the company were filed with the Secretary of State for the state of New York.

   1.3    **Duration.** The company will exist until dissolved as provided in this agreement.

   1.4    **Principal Office.** The company's principal office will initially be at 65-67 North Moore Street, Suite 2A, New York, New York 10013, but it may be relocated by the Members at any time.

   1.5    **Designated Office and Agent for Service of Process.** The company's initial designated office will be at 65-67 North Moore Street, Suite 2A, New York, New York 10013, and the name of its initial agent for service of process at that address will be JOHN C. DENIRO. The company's designated office and its agent for service of process may only be changed by filing a notice of the change with the Secretary of State of the state in which the articles of organization of the company were filed.

   1.6    **Purposes and Powers.** The company is formed for the purpose of engaging in the business of real estate brokerage business. The company has the power to do all things necessary, incident, or in furtherance of that business.

   1.7    **Title to Assets.** Title to all assets of the company will be held in the name of the company. No Member has any right to the assets of the company or any ownership interest in those assets except indirectly as a result of the Member's ownership of an interest in the company. No Member has any right to partition any assets of the company or any right to receive any specific assets on liquidation of the company or on any other distribution from the company.

2.    **Members, Contributions and Interests**

2.1    **Initial Members.** The names of the Members of the company, the amounts of their initial capital contributions, and their initial ownership interests are:

| Name | Contribution | Ownership Interest |
|---|---|---|
| JOHN C. DeNIRO ("DeNiro") | $10,000.00 | 60% |
| CHRISTOPHER MATHIESON ("Mathieson") | Future Services | 40% |

2.2    **Initial Capital Contributions.** The initial capital contribution of JOHN C. DeNIRO must be paid to the company, in cash, immediately after all parties have signed this agreement. CHRISTOPHER MATHIESON is not making any initial capital contribution. Rather, CHRISTOPHER MATHIESON is acquiring an interest in the profits and losses of the company in exchange for future services to be performed for the company by CHRISTOPHER MATHIESON.

2.3    **Additional Members.** Except as otherwise provided in the section of this agreement relating to substitution, additional Members of the company may be admitted only with the consent of all Members.

2.4    **Additional Contributions.** Except as otherwise provided in the act, no Member is required to contribute additional capital to the company. Additional capital contributions to the company may be made by the Members only with the Members' unanimous approval. If the Members approve additional capital contributions, the Members must agree on the amount of such contributions and must determine whether the contributions will affect the Members' ownership interests, and if so, what the effect will be.

2.5    **No Interest on Capital Contributions.** No interest will be paid on capital contributions.

2.6    **Capital Accounts.** An individual capital account must be maintained for each Member. A Member's capital account will be credited with all capital contributions made by the Member and with all income and gain (including any income exempt from federal income tax) allocated to the Member. A Member's capital account will be charged with the amount of all distributions made to the Member and with all losses and deductions (including deductions attributable to tax-exempt income) allocated to the Member. Members' capital accounts will be maintained in accordance with the

federal income tax accounting principles prescribed in Treasury Regulations §1.704-1(b)(2)(iv).

3.    **Allocation of Profits and Losses**

3.1    **Determination.** The net profit or net loss of the company for each fiscal year will be determined according to the accounting principles employed in the preparation of the company's federal income tax information return for that fiscal year. In computing net profit or net loss for purposes of allocation between Members, no special provision will be made for tax-exempt or partially tax-exempt income of the company, and all items of the company's income, gain, loss, or deduction required to be separately stated under IRC §703(a) will be included in the net profit or net loss of the company.

3.2    **Allocation of Net Profits and Net Losses.** After giving effect to the special allocations set forth in the sections of this agreement relating to special allocations of losses and regulatory allocations, the net profits or net losses of the company for any fiscal year will be allocated among the Members in proportion to their ownership interests.

3.3    **Special Allocations of Losses.** Notwithstanding the provisions of the section of this agreement relating to allocation of net profits and net losses, no allocation of net losses of the company may be made to any Member to the extent that the allocation would cause the Member to have a negative capital account at the end of the fiscal year in which the allocation would otherwise be made after adjusting the Member's capital account by (a) increasing it by the amounts the Member is deemed to be obligated to restore under Treasury Regulations §§1.704-2(g)(1) and 1.704-2(i)(5) (that is, the Member's share of partnership minimum gain and Member minimum gain), and (b) reducing it by the amounts described in Treasury Regulations §§1.704-1(b)(2)(ii)(d)(4), (5), and (6). Any net losses that cannot be allocated to a Member under the preceding sentence will be reallocated to the other Members in order to allocate the maximum possible amount of net losses to all Members. If any net losses are reallocated to another Member under this section, 100 percent of the net profits of the company for all subsequent fiscal years will be specially allocated to such other Member until the aggregate net profits specially allocated to such Member equal the aggregate net losses that have been reallocated to such Member. If net profits are specially allocated to more than one Member under this section, the net profits for any given fiscal year will be divided between such Members in proportion to the amount of the aggregate net losses that have been reallocated to each such Member and have not been offset by special net profit allocations as of the beginning of the fiscal year.

3.4    **Regulatory Allocations.** Notwithstanding the provisions of the sections of this agreement relating to allocation of net profits and net losses and special allocation of losses, the following special allocations will be made in the following order:

3.4.1    Except as otherwise provided in Treasury Regulations §1.704-2(f), if there is a net decrease in the partnership minimum gain (as defined in Treasury

Regulations §§1.704-2(b)(2) and 1.704-2(d)) of the company during any fiscal year, each Member will be specially allocated items of company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the Member's share of the net decrease in the partnership minimum gain of the company, determined in accordance with Treasury Regulations §1.704-2(g). Special allocations made under this subsection will be made to Members in proportion to their respective shares of the partnership minimum gain of the company at the end of the immediately preceding fiscal year, but no special allocations of income and gain will be required to be made to any Member to the extent the Member's share of the net decrease in the partnership minimum gain of the company results from a change in a debt obligation of the company that results in the Member's bearing the economic risk of loss with respect to the debt obligation, within the meaning of Treasury Regulations §1.752-2. The items of company income and gain to be specially allocated under this subsection will be determined in accordance with Treasury Regulations §§1.704-2(f)(6) and 1.704-2(j)(2). This subsection is intended to comply with the minimum gain chargeback provisions of Treasury Regulations §1.704-2(f) and is to be interpreted in a manner consistent with those provisions.

3.4.2    Except as otherwise provided in Treasury Regulations §1.704-2(i)(4), if there is a net decrease in partner nonrecourse debt minimum gain of the company during any fiscal year, each Member who has a share of the partner nonrecourse debt minimum gain, determined in accordance with Treasury Regulations §1.704-2(i)(5), will be specially allocated items of company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the Member's share of the net decrease in partner nonrecourse debt minimum gain, determined in accordance with Treasury Regulations §1.704-2(i)(4). The items of company income and gain to be specially allocated under this subsection will be determined in accordance with Treasury Regulations §§1.704-2(i)(4) and 1.704-2(j)(2). This subsection is intended to comply with the minimum gain chargeback provisions of Treasury Regulations §1.704-2(i) and is to be interpreted in a manner consistent with those provisions.

3.4.3    If any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations §§1.704-1(b)(2)(ii)(d)(4), (5), or (6) that result in the Member's capital account having a negative balance at the end of the fiscal year in which the adjustment, allocation, or distribution would otherwise be made after adjusting the Member's capital account by (a) increasing it by the amounts the Member is deemed to be obligated to restore under Treasury Regulations §§1.704-2(g)(1) and 1.704-2(i)(5) (that is, the Member's share of partnership minimum gain and Member minimum gain), and (b) reducing it by the amounts described in Treasury Regulations §1.704-1(b)(2)(ii)(d)(4), (5), and (6), the Member will be specially allocated items of company income and gain in an amount and manner sufficient to

-4-

eliminate the negative balance in the Member's capital account, to the extent required by the Treasury Regulations, as quickly as possible. This subsection is intended to comply with the qualified income offset provisions of Treasury Regulations §1.704-1(b)(2)(ii)(d) and is to be interpreted in a manner consistent with those provisions.

3.4.4    Nonrecourse deductions, as defined in Treasury Regulations §1.704-2(b)(2), for any fiscal year of the company will be specially allocated among the Members in proportion to each Member's respective share of losses under the section of this agreement relating to allocation of net profits and net losses.

3.4.5    Any partner nonrecourse deductions, as defined in Treasury Regulations §§1.704-2(i)(1) and 1.704-2(i)(2), for any fiscal year of the company will be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt, as defined in Treasury Regulations §1.704-2(b)(4), to which such partner nonrecourse deductions are attributable in accordance with Treasury Regulations §1.704-2(i)(1).

3.4.6    If an adjustment to the adjusted tax basis of any asset of the company required under IRC §§734(b) or 743(b) must be taken into account, under Treasury Regulations §1.704-1(b)(2)(iv)(m), in determining the capital accounts of Members, the amount of the adjustment to the capital accounts will be treated as an item of gain (if the adjustment increases basis) or loss (if the adjustment decreases basis), and such gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their capital accounts are to be adjusted under the Treasury Regulations.

The special allocations required under the preceding subsections of this section are intended to comply with requirements of the Treasury Regulations. The Members desire that, to the extent possible, all such special allocations be offset either with other additional special allocations or with special allocations of other items of company income, gain, loss, or deduction. Notwithstanding any other provision of the main section of this agreement relating to the allocation of profits and losses (other than the section relating to regulatory allocations), offsetting special allocations of company income, gain, loss or deduction must be made in whatever manner the Members reasonably determine appropriate so that, after such offsetting allocations are made, the capital account of each Member is, to the extent possible, equal to the capital account the Member would have had if the regulatory allocations were not part of this agreement and all items of company income, gain, loss, deduction, and credit were allocated pursuant to the sections of this agreement relating to allocation of net profits and net losses and to special allocations relating to losses.

3.5    **Allocations Solely for Tax Purposes.** In accordance with IRC §704(c) and the corresponding regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the company must be allocated among the Members, solely for income tax purposes, so as to take into account any variation

-5-

between the adjusted basis of the property for federal income tax purposes in the hands of the company and the agreed value of the property as set forth in this agreement, or in any document entered into at the time an additional contribution is made to the company. Any elections or other decisions relating to the allocations to be made under this section will be made by vote of the Members. The allocations to be made under this section are solely for purposes of federal, state, and local income taxes and will not affect, or in any way be taken into account in computing, any Member's capital account, allocable share of the net profits and net losses of the company, or right to distributions.

3.6    **Prorates.** If a Member has not been a Member during a full fiscal year of the company, or if a Member's ownership interest changes during a fiscal year, the net profit or net loss for the year will be allocated to the Member based only on the period of time during which the Member was a Member or held a particular ownership interest. In determining a Member's share of the net profit or net loss for a fiscal year, the Members may allocate the net profit or net loss ratably on a daily basis using the company's usual method of accounting. Alternatively, the Members may separate the company's fiscal year into two or more segments and allocate the net profits or net losses for each segment among the persons who were Members, or who held particular ownership interests, during each segment based on their ownership interests during that segment.

4.    **Distributions**

4.1    **Distributions to Pay Taxes.** To enable the Members to pay taxes on income of the company that is taxable to the Members, the company must make cash distributions to the Members, during each fiscal year, in an amount equal to 40 percent of the amount of the taxable income of the company for that fiscal year. Distributions must be paid at least quarterly during each fiscal year at times that coincide with the Members' payment of estimated taxes, and the amount of each distribution must be based on the anticipated taxable income of the company for the fiscal year of the distribution. The company's obligation to make distributions under this section is subject to the restrictions governing distributions under the Act.

4.2    **Additional Distributions.** Subject to the restrictions governing distributions under the Act, additional distributions of cash or property may be made from time to time by the company to the Members, at such times and in such amounts as the Members determine.

4.3    **Allocation of Distributions.** All distributions to pay taxes and additional distributions must be made to Members in proportion to their ownership interests.

5.    **Administration of Company Business**

5.1    **Management.** All Members have the right to participate in the management and conduct of the company's business. Subject to the limitations imposed by this

agreement or by action of the Members, each Member is an agent of the company and has authority to bind the company in the ordinary course of the company's business.

5.2    **Actions by Members.** Except as otherwise provided in this agreement, all decisions requiring action of the Members or relating to the business or affairs of the company will be decided by the affirmative vote or consent of Members holding a majority of the ownership interests. Members may act with or without a meeting, and any Member may participate in any meeting by written proxy or by any means of communication reasonable under the circumstances.

5.3    **Approval of Other Members Required.** In addition to the other actions requiring unanimous Member approval under the terms of this agreement, no Member has authority to do any of the following without the prior written consent of all other Members:

5.3.1    To sell, lease, exchange, mortgage, pledge, or otherwise transfer or dispose of the property or assets of the company;

5.3.2    To merge the company with any other entity;

5.3.3    To amend the articles of organization of the company or this agreement;

5.3.4    To incur indebtedness by the company other than in the ordinary course of business;

5.3.5    To authorize a transaction involving an actual or potential conflict of interest between a Member and the company;

5.3.6    To change the nature of the business of the company; or

5.3.7    To commence a voluntary bankruptcy case for the company.

5.4    **Devotion of Time; Outside Activities.** CHRISTOPHER MATHIESON is acquiring an interest in the company in exchange for future services. Accordingly, the full time and attention of CHRISTOPHER MATHIESON must be devoted to the affairs of the company, but CHRISTOPHER MATHIESON is entitled to engage in investment activities outside the company that do not consume significant amounts of time during the business day. Each of the other Members must devote so much time and attention to the business of the company as the Members agree is appropriate, and the other Members may engage in business and investment activities outside the company. Neither the company nor any other Member has any rights to the property, profits, or benefits of outside business or investment activities in which a Member is entitled to participate. But no Member may, without the consent of all other Members, enter into any business or investment activity that is competitive with the business of the company, or use any property or assets of the company other than for the operation

of the company's business. For this purpose, the property and assets of the company include, without limitation, information developed for the company, opportunities offered to the company, and other information or opportunities entrusted to a Member as a result of being a Member of the company.

5.5     **Compensation and Reimbursement**. Members who render services to the company will be entitled to such compensation as may be agreed on by the Members from time to time. It is not anticipated that CHRISTOPHER MATHIESON will receive any compensation for services provided to the company, except as otherwise agreed to by the parties, because CHRISTOPHER MATHIESON is receiving an interest in the profits and losses of the company in exchange for those services. Any compensation paid to a Member for services rendered will be treated as an expense of the company and a guaranteed payment within the meaning of IRC §707(c), and the amount of the compensation will not be charged against the share of profits of the company that would otherwise be allocated to the Member. Members are also entitled to reimbursement from the company for reasonable expenses incurred on behalf of the company, including expenses incurred in the formation, dissolution, and liquidation of the company.

5.6     **Self Interest**. A Member does not violate any duty or obligation to the company merely as a result of engaging in conduct that furthers the interest of the Member. A Member may lend money or transact other business with the company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, so long as the loan or other transaction has been approved or ratified by the Members. Unless otherwise provided by applicable law, a Member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.

6.     **Accounting and Records**

6.1     **Books of Account**. The Members must keep such books and records relating to the operation of the company as are appropriate and adequate for the company's business and for the carrying out of this agreement. At a minimum, the following must be maintained at the principal office of the company: (a) financial statements for the three most recent fiscal years; (b) federal, state, and local income tax returns for the three most recent fiscal years; (c) a register showing the current names and addresses of the Members; (d) a copy of the company's articles of organization and any amendments thereto; (e) this agreement and any amendments thereto; (f) minutes of any meetings of Members; and (g) consents to action by Members. Each Member will have access to all such books and records at all times.

6.2     **Fiscal Year**. The fiscal year of the company will be the calendar year.

6.3     **Accounting Reports**. Within 90 days after the close of each fiscal year, the company must deliver to each Member an unaudited report of the activities of the company for

the preceding fiscal year, including a copy of a balance sheet of the company as of the end of the year and a profit and loss statement for the year.

6.4    **Tax Returns.** The company must prepare and file on a timely basis all required federal, state, and local income tax and other tax returns. Within 90 days after the end of each fiscal year, the company must deliver to each Member a Schedule K-1, showing the amounts of any distributions, contributions, income, gain, loss, deductions, or credits allocated to the Member during the fiscal year.

6.5    **Tax Matters Partner.** Anytime the company has more than 10 Members, any Member is an entity other than an estate or a C corporation, or any Member is a nonresident alien individual, the Members must designate one of the Members as the tax matters partner of the company in accordance with IRC §6231(a)(7) and keep such designation in effect at all times.

7.    **Dissociation and Dissolution**

7.1    **Withdrawal.** A Member may withdraw from the company only after delivering written notice of withdrawal to the other Members at least 90 days prior to the effective date of the withdrawal.

7.2    **Expulsion.** A Member may be expelled from the company by an affirmative vote of the Members holding a majority of the ownership interests held by Members other than the expelled Member if the expelled Member has been guilty of wrongful conduct that adversely and materially affects the business or affairs of the company, or the expelled Member has willfully or persistently committed a material breach of the articles of organization of the company or this agreement or has otherwise breached a duty owed to the company or to the other Members to the extent that it is not reasonably practicable to carry on the business or affairs of the company with the expelled Member. The right to expel a Member under the provisions of this section does not limit or adversely affect any right or power of the company or the other Members to recover any damages from the expelled Member or to pursue other remedies permitted under applicable law or in equity. In addition to any other remedies, the company or the other Members may offset any such damages against any amounts otherwise distributable or payable to the expelled Member.

7.3    **Events of Dissolution.** Except as otherwise provided in this agreement, the company will dissolve on the earliest of the following events: (a) the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of any Member; (b) approval of a dissolution of the company by unanimous consent of the Members; or (c) at such time as the company has no Members. For purposes of this provision, the bankruptcy of a Member will be deemed to have occurred if: (a) the Member makes an assignment for the benefit of creditors; (b) the Member files a voluntary petition in bankruptcy; (c) the Member is adjudicated a bankrupt or insolvent; (d) the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or

regulation, or a proceeding against the Member seeking such relief is not dismissed within 120 days after the commencement of such proceeding; (e) the Member files an answer or other pleading admitting or failing to contest the material allegations filed against the Member in any proceeding of the foregoing nature; or (f) the Member seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member, or of all or any substantial part of the Member's property, or the appointment, without the Member's consent, of such a trustee, receiver, or liquidator is not vacated or stayed within 120 days after the appointment or after the expiration of the stay.

7.4    **Effect of Member's Dissociation.** Within 120 days following the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of a Member, the other Members (whether one or more) may elect to continue the company by themselves, or with others, and to cause the company to purchase the interest of the dissociating Member pursuant to the provisions of the sections of this agreement relating to purchase price and payment for Member's interest. The making of the election is in the sole discretion of the other Members and requires the consent of other Members holding a majority of the ownership interests held by the other Members. Notice of the election must be given in writing to the dissociating Member promptly after the election is made. If the other Members do not so elect, the company will be dissolved.

7.5    **Purchase Price.** If the other Members elect to cause the company to purchase the interest of a dissociating Member under the section of this agreement relating to effect of Member's dissociation, the purchase price of the dissociating Member's interest in the company will be equal to the sum of (a) the dissociating Member's capital account as of the date of the event of dissociation plus (b) the product of (i) the difference between the net value of the company and the aggregate amount of the capital accounts of all Members as of the date of the event of dissociation multiplied by (ii) the dissociating Member's ownership interest. The net value of the company may be determined by agreement between the other Members (acting by vote) and the dissociating Member. If an agreement on the value is not reached within 30 days following the election to purchase the interest of the dissociating Member, the net value of the company must be determined by a third party appraiser selected by the other Members who is reasonably acceptable to the dissociating Member. In determining the net value of the company, the appraiser must determine the difference between (a) the greater of the liquidation value of the assets of the company or the value of the company based on sale of the entire company as a going concern and (b) the aggregate amount of the indebtedness and liabilities of the company. If the appraisal is not completed within 120 days following the election to purchase the interest of the dissociating Member, either the other Members, or the dissociating Member may apply to a court of competent jurisdiction for the appointment of another appraiser, in which case the court-appointed appraiser must determine the net value of the company in accordance with the standards set forth in this section, and the purchase price will be determined based on the value determined by that appraisal.

7.6     **Payment for Member's Interest.** The purchase price for the interest of a Member purchased under the section of this agreement relating to effect of Member's dissociation will be paid as follows:

7.6.1    The purchase price will bear interest from the date of the election of the other Members to purchase the dissociating Member's interest at the prime rate of interest in effect on the date of the election as quoted in The Wall Street Journal or, if that publication is not available, another reputable national publication selected by the other Members that is reasonably acceptable to the dissociating Member.

7.6.2    The purchase price will be payable in accordance with the terms of a promissory note of the company providing for the payment of the principal amount in 60 equal monthly installments, including interest on the unpaid balance, with the first installment to be due one month after the date of closing and an additional installment to be due on the same day of each month thereafter until the promissory note is paid in full. The promissory note will bear interest from the date of the closing at the rate specified in the preceding subsection. The promissory note must provide that if any installment is not paid when due, the holder may declare the entire remaining balance, together with all accrued interest, immediately due and payable. Partial or complete prepayment of the remaining balance due under the promissory note will be permitted at any time without penalty, provided that any partial prepayment will not affect the amount or regularity of payments coming due thereafter.

7.6.3    The purchase must be closed within 30 days following the determination of the purchase price. At the closing, the dissociating Member must sign and deliver to the company a written assignment transferring the entire interest of the dissociating Member in the company to the company free and clear of all encumbrances. Such assignment must contain warranties of title and good right to transfer. At the closing, the company must pay the accrued interest on the purchase price then due to the dissociating Member, and the company must also deliver its promissory note to the dissociating Member. Each of the other Members must sign and deliver to the dissociating Member a security agreement granting a security interest to the dissociating Member in that percentage of the interest of the other Member in the company equal to the ownership interest of the dissociating Member being purchased by the company. The security agreement must be in a form reasonably acceptable to the attorney for the dissociating Member, and will secure payment of the promissory note by the company. The security agreement must provide that if there is a default in the payment of the promissory note by the company and the security interest is foreclosed or the interest in the company is retained by the secured party in satisfaction of the indebtedness, the interest may be transferred without the necessity of tendering the interest to the company under the section of this agreement relating to tender of interest and the

-11-

person acquiring the interest in the company will be admitted as a Member of the company without further consent of the Members being required.

*As an example of the operation of this provision, if the ownership interest of a dissociating Member was 25 percent and there are three other Members, each with an ownership interest of 33-1/3 percent after the purchase of the dissociating Member's ownership interest by the company, each of the other Members will be required to grant the dissociating Member a security interest in an ownership interest of 8-1/3 percent.*

7.7    **Effect of Purchase of Member's Interest.** A dissociating Member will cease to be a Member when the other Members elect to cause the company to purchase the dissociating Member's interest pursuant to the section of this agreement relating to effect of Member's dissociation. After that, the dissociating Member will have no rights as a Member in the company, except the right to have the dissociating Member's interest purchased in accordance with the terms of this agreement.

7.8    **Successor in Interest.** For purposes of this section relating to dissociation and dissolution, the term "dissociating Member" includes the dissociating Member's successor in interest.

8.    **Winding Up**

8.1    **Liquidation After Dissolution.** Following the dissolution of the company, the Members must wind up the affairs of the company unless the dissolution results from the dissociation of a Member and the other Members elect to continue the company under the provisions of this agreement relating to effect of Member's dissociation. If the affairs of the company are wound up, a full account must be taken of the assets and liabilities of the company, and the assets of the company must be promptly liquidated. Following liquidation of the assets of the company, the proceeds thereof must be applied and distributed in the following order of priority:

8.1.1    To creditors of the company in satisfaction of liabilities and obligations of the company, including, to the extent permitted by law, liabilities and obligations owed to Members as creditors (except liabilities for unpaid distributions);

8.1.2    To any reserves set up for contingent or unliquidated liabilities or obligations of the company deemed reasonably necessary by the Members, which reserves may be paid over to an escrow agent by the Members to be held by such escrow agent for disbursement in satisfaction of the liabilities and obligations of the company, with any excess being distributed to the Members as provided in the following subsection; and

8.1.3    To Members in proportion to the positive balances of their capital accounts, after taking into account all adjustments made to capital accounts for the fiscal year during which the distributions to Members are made.

8.2 **Distribution of Property in Kind.** Property of the company may be distributed in kind in the process of winding up and liquidation with the unanimous approval of the Members. Any property distributed in kind must be valued and treated for the company's accounting purposes as though the property distributed had been sold at fair market value on the date of distribution as provided in Treasury Regulations §1.704-1(b)(2)(iv)(e)(1). If property is distributed in kind, the difference between the fair market value of the property and its adjusted tax basis will, solely for the company's accounting purposes and to adjust the Members' capital accounts, be treated as a gain or loss on the sale of the property and will be credited or charged to the Members' capital accounts in the manner specified in the section of this agreement relating to capital accounts.

8.3 **Negative Capital Accounts.** If any Member has a negative balance in the Member's capital account on liquidation of the company, the Member will have no obligation to make any contribution to the capital of the company to make up the deficit, and the deficit will not be considered a debt owed to the company or any other person for any purpose.

9. **Transfer of Members' Interests**

9.1 **General Restrictions.** No Member may transfer all or any part of such Member's interest as a Member of the company except as permitted in this agreement. Any purported transfer of an interest or a part of an interest in violation of the terms of this agreement will be null and void and of no effect. For purposes of this section a "transfer" includes a sale, exchange, pledge, or other disposition, voluntarily or by operation of law.

9.2 **Tax Law Restriction.** Notwithstanding any other provision of this agreement, a Member may not make any sale or exchange of all or part of the Member's interest in the company if the interest sought to be sold or exchanged, when added to the total of all other interests sold or exchanged within a period of 12 consecutive calendar months prior to the proposed date of such sale or exchange, would, in the opinion of the certified public accountant of the company, result in the termination of the company for federal or state income tax purposes. For purposes of this section, the term "sale or exchange" has the same meaning the term has under IRC §708(b)(1)(B).

9.3 **Permitted Transfers.** Subject to the restrictions contained in the section of this agreement relating to tax law restriction, a Member may transfer all or a part of the Member's interest in the company with the prior written consent of all other Members. If the other Members do not consent to a particular transfer and the transfer does not violate the tax law restriction, the Member may transfer all or a part of the Member's interest if the interest to be transferred has been tendered for sale to the company in accordance with the section of this agreement relating to tender of interest, the tender has not been accepted within the time limit set forth in that section, the transfer is made to the transferee named in the notice of tender within 180 days after the notice

-13-

of tender is effective, and the transfer is at a price and on terms no more favorable to the transferee than those set forth in the notice of tender.

9.4    **Tender of Interest.** If a Member wishes to transfer all or part of the Member's interest in the company and the other Members do not consent, the interest, or part thereof, to be transferred must be tendered to the company and the other Members by giving written notice of the tender to the company and the other Members. The notice must contain the name and address of the proposed transferee, the price to be paid by the proposed transferee for the interest, if any, and the terms of the proposed transfer. If a Member's interest is transferred by operation of law, the successor in interest to the transferring Member may give the required notice of tender to the company and the other Members at any time following the transfer, and the successor in interest will be deemed to have given the notice of tender at the time any other Member gives notice to the successor in interest, to the company, and to all other Members of the failure to give the notice of tender. Within 30 days after a notice of tender is given, the Members may accept the tender on behalf of the company and have the company purchase the interest tendered for the lesser of the price set forth in the notice of tender (if the proposed transfer is to be by sale) or the price applicable to the purchase of a Member's interest pursuant to the section of this agreement relating to the effect of Member's dissociation. If the company does not exercise its option to purchase the tendered interest, one or more of the other Members may accept the tender within 30 days following the expiration of the time for the company to accept the tender and purchase the interest tendered for the lesser of the price set forth in the notice of tender (if the proposed transfer is to be by sale) or the price applicable to the purchase of a Member's interest pursuant to the section of this agreement relating to the effect of Member's dissociation (except that the Members purchasing the interest will act in the place of the other Members in determining the net value of the company). The other Members have the right to accept the tender and purchase the tendered interest in such proportions as they may agree on among themselves, or in the absence of such agreement, in proportion to each of their ownership interests as compared to the ownership interests of all other Members electing to purchase the interest. The tender must be accepted on behalf of the company or one or more other Members by giving notice of acceptance to the transferring Member or the transferring Member's successor in interest. Notwithstanding any other provision of this section, no acceptance of tender will be effective unless the tender is accepted by the company or by one or more of the other Members as to the entire interest tendered. A Member will not be required to sell a tendered interest to the company or the other Members unless the entire interest tendered is purchased. The purchase may, at the option of the company or other Members who are purchasing the interest, be on the terms set forth in the notice of tender, if any, or the terms set forth in the section of this agreement relating to payment for Member's interest. For purposes of those provisions, the date of the acceptance of the tender by the company or by the other Members will be deemed to be the date on which the other Members elected to purchase the interest of the dissociating Member.

-14-

9.5　**Effect of Tender**. The Member tendering an interest will cease to be a Member with respect to the tendered interest when the tender is accepted by the company or the other Members. Thereafter, the Member tendering the interest will have no rights as a Member in the company, except the right to have the tendered interest purchased in accordance with the terms of this agreement.

9.6　**Substitution**. If the interest of a Member is transferred, the transferee of the interest may be admitted as a Member of the company effective on the execution by the transferee and delivery to the company of a written agreement to be bound by all of the terms and provisions of this agreement. But the transferee is entitled to be admitted as a Member only if all of the other Members consent to the admission of the transferee as a Member, and this consent may be withheld reasonably or unreasonably. If a Member who is the only Member of the company transfers the Member's entire interest, the transferee will be admitted as a Member of the company effective on the transfer without the requirement of an agreement to be bound by this agreement or consent. If the transferee is not admitted as a Member, the transferee will have the right only to receive, to the extent assigned, the distributions from the company to which the transferor would be entitled. Such transferee will not have the right to exercise the rights of a Member, including, without limitation, the right to vote or inspect or obtain records of the company.

## 10.　Indemnification and Liability Limitation

10.1　**Indemnification**. Except as otherwise provided in this section, the company must indemnify each of the Members to the fullest extent permitted under the law of the state in which the company's articles of organization have been filed, as the same exists or may be amended in the future, against all liability, loss, and costs (including, without limitation, attorney fees) incurred or suffered by the Member by reason of or arising from the fact that the Member is or was a Member of the company, or is or was serving at the request of the company as a manager, Member, director, officer, partner, trustee, employee, or agent of another foreign or domestic limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise. The company may, by action of the Members, provide indemnification to employees and agents of the company who are not Members. The indemnification provided in this section does not supercede any other rights of any person to indemnification under any statute, agreement, resolution of Members, contract, or otherwise. But despite any other provision of this agreement, the company has no obligation to indemnify a Member for:

10.1.1　Any breach of the Member's duty of loyalty to the company;

10.1.2　Acts or omissions not in good faith that involve intentional misconduct or a knowing violation of law; or

10.1.3　Any unlawful distribution under the Act.

-15-

10.2 **Limitation of Liability.** No Member of the company is liable to the company or to the other Members for monetary damages resulting from the Member's conduct as a Member except to the extent that the Act, as it now exists or may be amended in the future, prohibits the elimination or limitation of liability of Members of limited liability companies. No repeal or amendment of this section or of the act will adversely affect any right or protection of a Member for actions or omissions prior to the repeal or amendment.

10.3 **Restriction on Use of Derivatives of the Company Name.** Each Member other than John C. DeNiro, agrees that for so long as they are Members of the Company and for a period of twenty (20) years thereafter, they will not, directly or indirectly, as principal, agent, employee, consultant, board member or otherwise, either alone or in association with other persons, firms or corporations, render any services or engage in any business or activity involving the real estate brokerage business using the name "DeNiro" or any deceptively similar name or mark within the United States of America. DeNiro, agrees that for so long as he is a Member of the Company he will not, directly or indirectly, as principal, agent, employee, consultant, board member or otherwise, either alone or in association with other persons, firms or corporations, render any services or engage in any business or activity involving the real estate brokerage business using the name "DeNiro" or any deceptively similar name or mark within the Restricted Territory (hereinafter defined). The parties hereby acknowledge that the name "DeNiro" is not a registered mark and that its value shall be derived in part from its association with the Company within the Restricted Territory (hereinafter defined) in the real estate industry and in part from the goodwill and business reputation that is being created by the activities of DeNiro in the real estate brokerage business in other areas of the United States, including, without limitation, the Florida counties of Indian River and Brevard. The parties further agree that they shall not use the failure or inability to register the name as a defense to the restrictive covenants set forth in this Agreement.

The Member and Company acknowledge that the provisions of this Section are reasonable and necessary for the protection and benefit of the Member's and Company's legitimate business interests.

The provisions of this Agreement, as well as the period of time, geographical areas and types and scope of restrictions of Member's activities specified herein are intended to be divisible; and in the event any provision herein shall be deemed invalid or unenforceable in any respect, as to any one or more periods of time, geographical areas, business or activities, the remaining provisions shall not thereby be affected, but shall remain in full force and effect; and this Paragraph shall be deemed to be amended without further action by the parties hereto to the extent necessary to render it valid or enforceable.

The Members and Company acknowledge that any breach or threatened breach of any of the provisions of this Paragraph or other provisions of the Agreement by a Member shall constitute an infringement of the legitimate business interests of

Company, which shall be presumed to constitute irreparable harm to Company; therefore, in recognition of the fact that any violation by Member of the provisions contained herein will cause irreparable or indeterminate damage or injury to Company, Company shall be entitled to obtain an injunction from any court of competent jurisdiction restraining any violation or threatened violation of this Agreement. Such right to an injunction shall be in addition to, and not in limitation of, any other rights or remedies Company may have for damages or otherwise under the Agreement and existing laws, specifically including any rights and benefits accruing to Company under common law.

10.4    Non-Compete. Matheison agrees that  that for so long as he is a  Member of the Company and for a period of twenty-four(24) months after separation from the Company he will not directly or indirectly act as an owner broker, manager or provide any supervisory, managerial or recruiting services to any other persons, firms or corporations, rendering real estate brokerage business, within the boroughs of MANHATTAN, STATEN ISLAND, BROOKLYN, BRONX and QUEENS, State of New York or within a 10 mile radius of any other geographical area where the Company, presently, or at a future date is actively contemplating a future business (the "Restricted Territory"). Notwithstanding the foregoing, after terminating his interest in the Company, Matheison may accept a position as a sales agent with another person or company within the Restricted Territory provided he does not directly or indirectly have or with the passing of time shall not acquire an equity interest in such enterprise, and further provided that he does not exercise any managerial duties or have any responsibility for or any involvement with the recruitment of new agents. Matheison shall disclose the restrictions set forth in this paragraph to all potential employers or contractors.  Separation from the Company as used in this Agreement shall the date on which a Member surrenders by sale or other transfer their equity interest in the Company.

Matheison further agrees that for so long as he is a Member of the Company, and for a period of two (2) years following his separation from the Company, Matheison shall not solicit, hire or employ: (a) any employee or independent contractor of the Company  who has their real estate license with the Company; (b) any person who was an employee or independent contractor and who was engaged as a sales agent of Company for a period of twelve (12) months after such person terminates his/her employment or independent contractor relationship with the Company.

11.    Miscellaneous Provisions

11.1    **Amendment**. The Members may amend or repeal all or part of this agreement by unanimous written agreement. This agreement may not be amended or repealed by oral agreement of the Members.

11.2    **Binding Effect**. The provisions of this agreement will be binding on and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the Members. But this section may not be construed as a modification of any restriction on transfer set forth in this agreement.

-17-

11.3    **Notice.** Except as otherwise provided in other sections of this agreement, any notice or other communication required or permitted to be given under this agreement must be in writing and must be mailed by certified mail, return receipt requested, with postage prepaid. Notices addressed to a Member must be addressed to the Member's address listed in the section of this agreement relating to initial Members, or if there is no such address listed for a Member, the address of the Member shown on the records of the company. Notices addressed to the company must be addressed to its principal office. The address of a Member or the company to which notices or other communications are to be mailed may be changed from time to time by the Member's or the company's giving written notice to the other Members and the company. All notices and other communications will be deemed to be given at the expiration of three days after the date of mailing.

11.4    **Litigation Expense.** If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this agreement, including any proceeding in the United States Bankruptcy Court, the prevailing party in such proceeding will be entitled to recover a reasonable attorney's fee in such proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law.

11.5    **Additional Documents.** Each Member must execute such additional documents and take such actions as are reasonably requested by the other Members in order to complete or confirm the transactions contemplated by this agreement.

11.6    **Counterparts.** This agreement may be executed in two or more counterparts, which together will constitute one agreement.

11.7    **Governing Law.** This agreement will be governed by the law of the state in which the articles of organization of the company have been filed.

11.8    **Severability.** If any provision of this agreement is invalid or unenforceable, this will not affect the validity or enforceability of the remaining provisions.

11.9    **Third Party Beneficiaries.** The provisions of this agreement are intended solely for the benefit of the Members and will create no rights or obligations enforceable by any third party, including any creditor of the company, except as otherwise provided by applicable law.

11.10   **Authority.** Each individual executing this agreement on behalf of a corporation or other entity warrants that he or she is authorized to do so and that this agreement will constitute the legally binding obligation of the corporation or other entity that the individual represents.

11.11   **Interpretations.** This Agreement shall not be construed more strictly against one party than against the other merely because it may have been prepared by counsel for one of the parties, it being recognized that both parties have contributed substantially and materially to its preparation.

11.12  **Legal Counsel.**  This Agreement has been prepared by the law offices of Lorenzo & Pike, LLP as counsel for the Company.  Each party hereby agrees and understands that the agreement has drafted to reflect the request of all Members which have been submitted to counsel.  However, by his execution of this Agreement each Member acknowledges and agrees that Lorenzo & Pike, LLP represents only the Company and does not represent any one or more of the Members in connection with the execution of this Agreement. Each Member further acknowledges that they have been advised to seek independent counsel in connection with the execution of this Agreement and that each Member has refused to seek independent counsel. Each Member agrees that he has not relied upon any advise rendered by Lorenzo & Pike LLP or any of its attorneys in connection with the execution of this Agreement. Matheison understands and agrees that outside of the preparation and execution of this Agreement, Lorenzo & Pike, LLP has represented and continues to represent DeNiro in various matters. By their execution of this Agreement, Mathieson and DeNiro agree to such continued representation and acknowledge that such representation does not constitute a conflict of interest or hereby waive such conflict, if any.

[Signature Page Attached]

IN WITNESS WHEREOF, the parties hereto have sworn to and executed this Agreement as of the date first above written.

By: _John C. DeNiro_ (signature)
Name: John C. DeNiro
Contribution: $10,000.00
Member's Percentage
Interest 60%

By: _____ (signature)
Name: CHRISTOPHER MATHIESON
Contribution:  -0- (SERVICES)
Member's Percentage
Interest 40%